[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-12312
Non-Argument Calendar

_____

D.C. Docket No. 1:09-cr-20327-JLK-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL J. MUZIO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 18, 2016)

Before TJOFLAT, ROSENBAUM, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Michael Muzio appeals *pro se* the denial of his counseled motion for a new trial under Fed. R. Crim. P. 33, based on two pieces of alleged newly discovered evidence:  a letter from a co-conspirator and Federal Bureau of Investigation ("FBI") 302 Reports of interviews with a key witness.  He argues that the government suppressed the FBI reports in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), and that this evidence establishes that the prosecutor knowingly allowed the witness to falsely testify against Muzio, in violation of *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972).  Muzio contends that the district court failed to consider the FBI reports and should have held an evidentiary hearing.  After careful review, we affirm the denial of Muzio's motion for a new trial and the denial of his request for an evidentiary hearing.

## I.

Muzio was indicted on charges of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, wire fraud, in violation of 18 U.S.C. § 1343, securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff(a) and 17 C.F.R. § 240.10b-5, and making false statements, in violation of 18 U.S.C. § 1001(a)(2). The charges arose of out Muzio's efforts to improperly manipulate the market for shares of a public shell corporation, International Business Ventures Group ("IBVG"), by issuing false or misleading press releases and by buying and selling shares between companies under his control to artificially inflate and stabilize

2

share prices.  The case was heard by a jury, which found Muzio guilty on all charges that were submitted to it.[1]  We affirmed Muzio's convictions and sentences on direct appeal, finding, among other things, sufficient evidence to support his various convictions.  *United States v. Muzio*, 757 F.3d 1243, 1245 (11th Cir. 2014) (concluding that his "claims lack merit and do not warrant further discussion").

## A.

We begin by summarizing some of the key evidence adduced by the government at trial.  In April 2008, Brian Taglieri, the government's main witness, began working for HomePals with Ronnie Bass and Abner Alabre, among others.  HomePals was a Ponzi scheme that targeted Haitian-Americans in South Florida, promising to double investments within 90 days through day trading on the stock market.  In reality, investor funds were diverted at least in part for the use and benefit of Taglieri and others, and investors were repaid, if at all, out of an account into which new investor funds were deposited.

Taglieri met Muzio in July 2008, when Taglieri, Bass, Alabre, and Muzio discussed the potential investment of HomePals in Muzio's cigar bar and a night club.  In later discussions, and upon hearing HomePals's plan to double investments, Muzio recommended that HomePals transfer its assets to a public

---

[1] One count was dismissed on the government's motion at the close of its case-in-chief.

3

company so that HomePals could pay off its investors with stock in the new company. HomePals agreed, so Muzio incorporated and registered IBVG as a Florida company and took the steps necessary to take the company public.

Muzio controlled most aspects of IBVG's operations. Though Muzio designated Taglieri as the CEO, Muzio drafted the board minutes and corporate minutes for Taglieri to sign; controlled IBVG's dealings with Pink Sheets, which lists lower-tier stocks; handled interactions with the stock transfer agent, which issued the stock certificates; and wrote press releases to generate new investments.

Muzio also handled the stock trades that were at the heart of the scheme. As Muzio explained to Taglieri, to maintain IBVG's stock, in order to bring in new investments, HomePals needed to invest approximately $25,000 per month into stock trades. Muzio told Taglieri that he would trade the stock back and forth between companies under his control, which would inflate the share price and show the public that a market existed for the stock. Between July and November 2008, Muzio and Taglieri had numerous conversations about trading IBVG stock, and Muzio frequently asked Taglieri for money to trade IBVG stock. As of November 1, 2008, accounts controlled by Muzio owned 60 percent of IBVG shares. And from October 24, 2008, through January 5, 2009, Muzio was responsible for 73% of the trading volume in IBVG shares.

In addition, Muzio gave presentations to potential investors to entice them to purchase IBVG stock and to convert their HomePals notes to IBVG stock. Many did so. These presentations contained numerous factual inaccuracies about IBVG as a company and about the stock that investors would receive. For example, investors were promised stock that could be freely traded, but they actually received "restricted" stock that could not be sold or traded freely. At a presentation in December 2008, after HomePals began to have serious financial troubles, Muzio assured investors that things would work out because he was controlling and manipulating the market for IBVG stock.

Muzio also drafted several press releases containing false information to try to attract outside investors. The press releases falsely asserted that IBVG had completed deals with companies to provide credit cards, calling cards, and pre-paid electric meters. While Muzio had taken steps to put the deals together, the deals had not been and never were consummated.

Taglieri began cooperating with law enforcement in February 2009. From that point on, he recorded his conversations with Muzio. On February 18, 2009, Muzio told Taglieri that he had "one trump card to play" to "to try walk away with eight or nine hundred thousand." The proposal involved issuing "five press releases in a row" and "sell[ing] a million shares" at low cost, which would "obliviate the stock." The next day, Muzio emailed Taglieri to terminate his

5

supposed consulting contract with the company.  The email stated, "recently I have discovered company activity which is very alarming and I must end any and all working matters with the company."

After the Securities and Exchange Commission ("SEC") issued a "trading suspension order" on IBVG stock in March 2009, Muzio called the SEC's Miami office to ask why and then falsely told the SEC that he had never sold any shares of IBVG stock.  Muzio later falsely told an FBI agent that he had not talked with Taglieri after allegedly resigning from IBVG as a consultant in February 2009, when, in fact, Muzio spoke with Taglieri on the same date the trading suspension order issued in March 2009.

Muzio testified in his own defense at trial.  In Muzio's telling, he was a consultant to IBVG trying to help what he believed to be a legitimate company repay its investors.  Muzio claimed that he was unaware that HomePals was a Ponzi scheme until December 2008.  He stated that he resigned in February 2009 because he was not comfortable being associated with HomePals and Taglieri.

**B.**

While Muzio's direct appeal was pending, he filed the instant motion for a new trial under Rule 33, Fed. R. Crim. P., on the basis of alleged newly discovered evidence.  This evidence consisted of FBI 302 Reports of Investigation regarding Taglieri's interviews with FBI agents (the "Taglieri 302s" or "302s"), which the

government disclosed after trial, and a letter from Bass (the "Bass letter"), a co-defendant who was in the same jail pod with Muzio after the trial.

According to Muzio's motion for new trial, the Taglieri 302s—which were not attached to the motion in any form—diminished Taglieri's credibility, corroborated Muzio's testimony, contradicted the government's theory of the case, and showed that some of Taglieri's trial testimony was false. Specifically, Muzio asserted, the 302s showed that Taglieri was siphoning off more money from HomePals than his trial testimony suggested, which, in turn, showed that Taglieri had a more prominent role with IBVG and that Taglieri, and not Muzio, was making operational decisions for IBVG. Muzio also reported that the 302s contained information about Taglieri's other business ventures and his connections with the Gambino crime family. Without this evidence, Muzio argued, his trial counsel was unable to effectively cross-examine Taglieri about his role with IBVG.

As for the Bass letter, it stated that Muzio was a consultant to IBVG and that Muzio did not prepare the PowerPoint presentation used in October 2008.

A magistrate judge issued a report and recommendation ("R&R") to the district court that Muzio's Rule 33 motion be denied. With regard to the Bass letter, the magistrate judge found that it offered "nothing but cumulative statements about facts Defendant was well informed of before trial." For example, Taglieri's

7

trial testimony established that a PowerPoint presentation used in a October 2008 investor meeting was created by various persons at HomePals, not by Muzio, and the jury heard numerous iterations of Muzio's claim that he was simply a consultant to IBVG.

As for the Taglieri 302s, the magistrate judge found that they were insufficient to undermine confidence in the verdict. According to the magistrate judge, the information in the 302s—as described by Muzio, given that the 302s were not attached to the motion for new trial—was simply "impeachment evidence" that was consistent with Taglieri's trial testimony and cumulative of evidence that had been disclosed to Muzio before trial. For instance, the trial transcript reflected that defense counsel had received bank records showing that Taglieri was using investor funds on other business ventures, and Taglieri himself testified on cross-examination that he used HomePals funds for personal expenses. Thus, the magistrate judge concluded that Muzio was well aware of the essential facts that would have allowed him to take advantage of any exculpatory evidence.

Because Muzio had put forth no evidence that undermined confidence in the outcome of the trial, and the information he claimed he did not receive was actually received in other forms, the magistrate judge recommended denying the motion for new trial and, because the issues were straightforward, found no reason

8

to hold an evidentiary hearing.  The district court adopted the magistrate judge's recommendation over Muzio's objections.  Muzio now appeals.

## II.

We review the denial of a Rule 33, Fed. R. Crim. P., motion for a new trial and an evidentiary hearing for an abuse of discretion.  *United States v. Isaacson*, 752 F.3d 1291, 1308 (11th Cir. 2014).

The Federal Rules of Criminal Procedure permit the district court to vacate a judgment and grant a new trial "if the interest of justice so requires," including where newly discovered evidence casts doubt on the validity of a conviction. Fed. R. Crim. P. 33(a), (b)(1).  Motions for a new trial are highly disfavored and should be granted with great caution.  *United States v. Scrushy*, 721 F.3d 1288, 1304 (11th Cir. 2013).  An evidentiary hearing on a Rule 33 motion is not required where "the record contained all the evidence needed to dispose of each of the grounds asserted as a basis for a new trial."  *Id.* at 1305 n.30.

To succeed on a motion for a new trial based on newly discovered evidence, the movant must establish four elements:  (1) the evidence was discovered after trial; (2) the failure of the defendant to discover the evidence was not due to a lack of due diligence; (3) the evidence is material, and not merely cumulative or impeaching; (4) the evidence is such that a new trial would probably produce a different result.  *Id.* at 1304–05; *see United States v. Schlei*, 122 F.3d 944, 991

(11th Cir. 1997).  "The failure to satisfy any one of these elements is fatal to a motion for a new trial."  *Schlei*, 122 F.3d at 991 (quoting *United States v. Lee*, 68 F.3d 1267, 1274 (11th Cir. 1995)).

To obtain a new trial on the basis of a *Brady* violation, the defendant must show the following:  (1) the government possessed material, exculpatory evidence; (2) the defendant did not possess that evidence and could not have possessed the evidence with due diligence; (3) the government suppressed the favorable evidence; and (4) a reasonable probability of a different outcome exists if the evidence had been disclosed to him.  *United States v. Vallejo*, 297 F.3d 1154, 1164 (11th Cir. 2002).  The suppressed evidence must be "material either to guilt or to punishment."  *Brady*, 373 U.S. at 87, 83 S. Ct. at 1196–97.

The related rule of *Giglio* applies where "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury."  *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397 (1976); *Giglio*, 405 U.S. at 154, 92 S. Ct. at 766.  In order to establish a *Giglio* violation, "a defendant must show the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material."  *United States v. McNair*, 605 F.3d 1152, 1208 (11th Cir. 2010).  The materiality

element is met if there is "a reasonable likelihood the false testimony could have affected the judgment of the jury." *Id.*

Here, the district court did not abuse its discretion in denying Muzio's motion for a new trial. Regarding the Bass letter, Muzio does not dispute the district court's finding that it contained "nothing but cumulative statements about facts Defendant was well informed of before trial." Because Muzio was "well aware of [Bass's] proposed testimony prior to trial," the proposed testimony is not newly discovered evidence for purposes of Rule 33. *United States v. DiBernardo*, 880 F.2d 1216, 1224 (11th Cir. 1989). Moreover, the fact that Muzio may have been hired as a "consultant" for IBVG and not as a "leader, organizer, officer, director or employee" does not undermine any of the evidence regarding Muzio's actual actions, which Muzio largely corroborated in his own testimony. Accordingly, we affirm the district court's determination that the Bass letter did not warrant a new trial.

With regard to the Taglieri 302s, the district court found that they did not contain any evidence that undermined Muzio's convictions. Indeed, the court found that the 302s were consistent with Taglieri's trial testimony and with information that had been disclosed before trial. Specifically, Taglieri admitted at trial to using investor funds for personal expenses, including luxuries. And the district court found that the government, before trial, provided Muzio with

11

financial records containing the same information regarding Taglieri's outside business dealings that Muzio claimed he discovered for the first time in the 302s. Because the information had been disclosed by the government in other forms, the court concluded, no *Brady* violation had occurred, as Muzio was well aware of the essential facts necessary to take advantage of any exculpatory evidence. *See United States v. Davis*, 787 F.2d 1501, 1505 (11th Cir. 1986) ("[T]he *Brady* rule does not apply if the evidence in question is available to the defendant from other sources."). Despite broadly asserting that the 302s contradicted Taglieri's trial testimony, Muzio does not challenge the district court's specific findings that he received the allegedly newly discovered information in other forms before trial. Our review of the record supports the district court's determination on this ground.

Nor has Muzio presented any basis for concluding that the prosecutor knowingly used false testimony at trial. *See Giglio*, 405 U.S. at 154, 92 S. Ct. at 766. The only allegedly false statements that Muzio points to on appeal are Taglieri's statements that Homepals and IBVG are separate entities and that IBVG contained no assets, but Muzio does not provide any substantiation or support for his allegations that these statements are untrue. In any case, Muzio has not explained how these statements, even if false, were material to his convictions or were reasonably likely to affect the judgment of the jury. *See McNair*, 605 F.3d at 1208.

12

Overall, we find ample support in the record for the district court's determination that, even if Muzio had received both the Bass letter and the Taglieri 302s before trial, there is no reasonable probability of a different outcome. *See Scrushy*, 721 F.3d at 1304; *McNair*, 605 F.3d at 1208; *Vallejo*, 297 F.3d at 1164. The proffered evidence was mainly impeaching, cumulative, known to Muzio before trial, or provided by the government in other forms. Moreover, the proffered evidence did little to undermine the specific evidence of Muzio's actions in this case, which the government established through testimony from various witnesses (not only Taglieri), documentary evidence in the form of email correspondence, and recorded conversations between Muzio and Taglieri. In light of the substantial and specific evidence of Muzio's guilt, his general and conclusory allegations that the alleged newly discovered evidence would have affected the outcome are largely speculative and do not rise to the level sufficient to warrant granting a new trial on any of the grounds asserted. *See Ross v. State of Texas*, 474 F.2d 1150, 1153 (5th Cir. 1973) ("[T]he likelihood of changing a jury's decision as a result of newly discovered evidence must rise considerably above the level of speculation.").[2]

---

[2] This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

13

### III.

Muzio presents a few other challenges to the district court's handling of his case, all of which we find unpersuasive or misguided. First, Muzio was not prevented from submitting the Taglieri 302s or other evidence with his motion for new trial. He was allowed to attach the reports as exhibits to his motion for a new trial, as he did with the Bass letter, but he failed to do so. Accordingly, the district court did not fail to conduct a *de novo* review of the record on that basis.

Second, Muzio's challenges to his sentence and his restitution are beyond the scope of relief available under a Rule 33 motion because they do not concern a trial defect. *See* Fed. R. Crim. P. 33(a).

Finally, we reject Muzio's request that we order the district court to issue an amended judgment so that he can file a second direct appeal. Muzio's convictions and sentences have been affirmed on direct appeal, *Muzio*, 757 F.3d at 1245, and we now affirm the denial of his motion for a new trial. Accordingly, he is not entitled to resentencing or to another bite at the appellate apple.

### IV.

For the reasons stated, the district court did not abuse its discretion by denying Muzio's Rule 33 motion for a new trial, nor did it abuse its discretion by failing to hold an evidentiary hearing, as the existing record contained all the

evidence needed to dispose of each of the grounds for a new trial asserted. *See Scrushy*, 721 F.3d at 1304–05 & n.30.

**AFFIRMED.**