**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 10-4774, 11-4587, 12-2077
_____

UNITED STATES OF AMERICA

v.

GEORGE GEORGIOU,
                            Appellant
_____


Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Crim. No. 2-09-cr-00088-001)
District Judge: Honorable Robert F. Kelly
_____


Argued March 19, 2014
_____


Before: CHAGARES, GREENAWAY, JR., and
VANASKIE, *Circuit Judges*.

(Opinion Filed: January 20, 2015)

Louis D. Lappen, Esq. **[ARGUED]**
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

      *Counsel for Appellee*

Scott J. Splittgerber, Esq. **[ARGUED]**
Bachner & Associates
39 Broadway
Suite 1610
New York, NY 10006

Hope C. Lefeber, Esq.
1500 John F. Kennedy Boulevard
Two Penn Center Plaza, Suite 1205
Philadelphia, PA 19102

      *Counsel for Appellant*

_____

OPINION
_____

GREENAWAY, JR., *Circuit Judge*.

A federal jury convicted Appellant George Georgiou ("Appellant" or "Georgiou") of conspiracy, securities fraud, and wire fraud for his participation in planned manipulation of the markets of four publicly traded stocks, resulting in

2

more than $55,000,000 in actual losses. The District Court sentenced him to 300 months' imprisonment, ordered him to pay restitution of $55,823,398 and ordered that he pay a special assessment of $900. The Court also subjected Georgiou to forfeiture of $26,000,000.

For the first time on appeal, Georgiou argues that under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), his securities and wire fraud convictions were improperly based upon the extraterritorial application of United States law. Thus, we must determine as a matter of first impression whether the purchases and sales of securities issued by U.S. companies through U.S. market makers acting as intermediaries for foreign entities constitute "domestic transactions" under *Morrison*. For the reasons set forth below, we find that these transactions are "domestic transactions," and that his conviction was not based upon the improper extraterritorial application of United States law. Georgiou also argues that the District Court erred in denying his motion for a new trial based on purported *Brady* and Jencks Act violations. He also asserts that the District Court erred on several evidentiary and sentencing issues. We find no error. Thus, we will affirm the District Court's Judgment of Conviction.

## I.

### A. Factual Background

From 2004 through 2008, Georgiou and his co-conspirators engaged in a stock fraud scheme resulting in more than $55 million in actual losses. The scheme centered on manipulating the markets of four stocks: Neutron Enterprises, Inc. ("Neutron"), Avicena Group, Inc.

("Avicena"), Hydrogen Hybrid Technologies, Inc. ("HYHY"), and Northern Ethanol, Inc. ("Northern Ethanol") (collectively, "Target Stocks"). At all relevant times, the Target Stocks were quoted on the OTC Bulletin Board ("OTCBB")[1] or the Pink OTC Markets Inc. ("Pink Sheets").[2]

In order to facilitate their scheme, Georgiou and his co-conspirators opened brokerage accounts in Canada, the Bahamas, and Turks and Caicos. Once opened, the co-conspirators used these accounts to engage in manipulative trading in the Target Stocks. Specifically, by trading stocks between the various accounts they controlled, the co-conspirators artificially inflated the stock prices and

---

[1] The OTCBB is "[a]n interdealer quotation system for unlisted, over-the-counter securities. The OTC Bulletin Board or 'OTCBB' allows Market Makers to display firm prices for domestic securities, foreign securities, and [American Depository Receipts] that can be updated on a real-time basis." *OTCBB Glossary,* Financial Industry Regulatory Authority ("FINRA"), http://www.finra.org/Industry/Compliance/MarketTransparen cy/OTCBB/Glossary/P126264 (last visited Jan. 5, 2015).

[2] The Pink Sheets, now known as OTC Market Group Inc., is "an electronic inter-dealer quotation system that displays quotes from broker-dealers for many over-the-counter (OTC) securities." *OTC Link LLC*, SEC, http://www.sec.gov/answers/pink.htm (last visited Jan. 5, 2015).

created the false impression that there was an active market in each Target Stock.

As a result of this manipulation, Georgiou and his co-conspirators were able to sell their shares at inflated prices. In addition, these artificially inflated shares would be used as collateral to fraudulently borrow funds on margin and obtain millions of dollars in loans from Caledonia Corporate Management Group Limited ("Caledonia") and Accuvest Limited ("Accuvest"), both brokerage firms based in the Bahamas. Eventually, these accounts experienced severe trading losses since the assets purportedly serving as collateral proved to be worthless.[3]

In June 2006, unbeknownst to Georgiou, Kevin Waltzer,[4] one of his co-conspirators, began cooperating in an FBI sting operation. Through Waltzer's cooperation, the FBI monitored Georgiou's activities, including many of his emails, phone calls and wire transfers.

---

[3] Indeed, Caledonia was forced to liquidate its business, resulting in approximately $25 million in losses. These losses were sustained by the firm's clients, many of whom lost their entire retirement savings.

[4] Waltzer pled guilty to one count of wire fraud, one count of mail fraud, and one count of money laundering, pursuant to a written plea agreement. He was sentenced to a term of imprisonment of 132 months, followed by a term of supervised release, and ordered to pay $40,675,241.55 in restitution.

### 1. Georgiou's Four Manipulation Schemes: Neutron, Avicena, HYHY, and Northern Ethanol

Georgiou and his co-conspirators manipulated the prices of the Target Stocks by creating matched trades,[5] wash sales,[6] and misleading email blasts. They used various alias accounts, nominees, and offshore brokerage accounts to conceal both their ownership of the Target Stocks and their involvement in the fraudulent scheme.

At least some of the manipulative trades were transacted through market makers[7] located in the United

---

[5] "A 'matched trade' is an order to buy or sell securities that is entered with knowledge that a matching order on the opposite side of the transaction has been or will be entered for the purpose of: (1) creating a false or misleading appearance of active trading in any publicly traded security; or (2) creating a false or misleading appearance with respect to the market for any such security." (Indictment ¶ 9.)

[6] "A 'wash sale' is an order to buy or sell securities resulting in no change of beneficial ownership for the purpose of: (1) creating a false or misleading appearance of active trading in any publicly traded security; or (2) creating a false or misleading appearance with respect to the market for any such security." (Indictment ¶ 10.)

[7] "A market maker is a firm that facilitates trading in a stock, provides quotes [for] both a buy and sell price for a stock, and potentially profits from the price spread." (Indictment ¶ 33.); *see also* 15 U.S.C. § 78c(38) (A "market maker means any specialist permitted to act as a dealer . . . and any dealer who,

States. Georgiou communicated via phone and e-mail with Waltzer about their plans, and also had occasional in-person meetings with Waltzer and others in the United States about these schemes. In these communications, Georgiou provided direction on how to implement the manipulative schemes, and demonstrated his role and culpability in orchestrating and perpetrating the fraud. After fourteen months, Georgiou wired $5,000 to the account of an undercover FBI agent as part of a test transaction. Six days later, Georgiou was arrested.

## 2. The Caledonia Fraud

In December 2006, Georgiou opened a margin-eligible account in his wife's name at Caledonia. As a result, Georgiou was able to obtain loans and purchase stock without using his own funds. Georgiou represented to the principals at Caledonia that the margin in his account would be collateralized by approximately $15 million worth of Avicena and Neutron stock, but did not disclose that the value of these securities had been artificially inflated.

In March 2007, Georgiou borrowed approximately $3,394,000 from Caledonia to purchase 1,697,000 shares of Avicena from Waltzer. That loan was secured by Avicena and Neutron stock held in the name of Georgiou's wife at another brokerage firm, and was never repaid.

---

with respect to a security, holds himself out (by entering quotations in an inter-dealer communications system or otherwise) as being willing to buy and sell such security for his own account on a regular or continuous basis.")

During the same month, Georgiou borrowed approximately $2.8 million from Caledonia to purchase Neutron stock and to provide financing to Neutron. The loan was ostensibly secured by Avicena and Neutron stock held in a different name at another brokerage firm. This loan was also never repaid. Caledonia was unable to cover the substantial deficits incurred as a result of Georgiou's activities. Ultimately, Caledonia suffered approximately $25 million in losses. The firm was later dissolved and liquidated.

### 3.    The Accuvest Fraud

In June 2007, Georgiou met with representatives of Accuvest in the Bahamas to discuss opening a brokerage account. In September 2007, Georgiou opened an account at Accuvest in a different name. The trading in the account was handled through William Wright Associates ("Wright"), an Accuvest affiliate based in California. From October 2007 through February 2008, Georgiou deposited HYHY and Northern Ethanol stock into this account, and in return, Accuvest provided a margin loan of ten percent of the value of the account. Georgiou did not disclose that the value of these securities had been artificially inflated. On several occasions in 2008, Georgiou directed Wright, via email, to wire cash from this account to Avicena, or Team One Marketing, a Canadian company associated with Georgiou.

In August 2008, Georgiou instructed Wright to open a second Accuvest account, which was funded with 10 million shares of Northern Ethanol. As had happened before, Georgiou did not disclose that the value of these securities had been artificially inflated. Georgiou failed to repay the money that he had borrowed on margin and in cash loans

from Accuvest. The artificially inflated stock did not cover the loans and Accuvest lost at least $4 million.

## B.  Procedural History

Following a three-week trial, a jury found Georgiou guilty of one count of conspiracy, in violation of 18 U.S.C. § 371, four counts of securities fraud, in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. §§ 78j(b) and 78ff, and four counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349.

Georgiou was sentenced to 300 months' imprisonment, and ordered to pay over $55 million in restitution.

## II.

The District Court had jurisdiction under 15 U.S.C. § 78aa and 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## III.

### A.  Extraterritorial Effect of United States Securities Law

#### 1.  Standard of Review

For the first time on appeal, Georgiou argues that his securities fraud convictions are improperly based on an exterritorial application of United States law. He asserts that without proof that any securities transactions occurred in the United States, the jury lacked sufficient evidence upon which to convict him. He further asserts that the District Court erred in failing to require that the jury base it verdicts solely on

domestic transactions.  Georgiou relies on *Morrison*, which held that Section 10(b) of the Act only proscribes "deceptive conduct [made] 'in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered.'"  561 U.S. at 266 (quoting 15 U.S.C. § 78j(b)).

Because Georgiou raised neither argument below, we review for plain error.  Fed. R. Crim. P. 52(b); *Henderson v. United States*, 133 S. Ct. 1121, 1124-25 (2013); *United States v. Riley*, 621 F.3d 312, 321-22 (3d Cir. 2010).[8]  A finding of "plain error" is warranted if: "(1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable dispute'; (3) the error 'affected the appellant's substantial rights, which in the ordinary case means' it affected the outcome of the district court proceedings'; and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"  *United States v. Marcus*, 560 U.S.

---

[8] Although *Morrison* was decided after Georgiou's trial, the standard of review remains the same.  *See Griffith v. Kentucky*, 479 U.S. 314, 328 (1987) ("[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past."); *see also United States v. Vilar*, 729 F.3d 62, 70 (2d Cir. 2013) ("Plain error review applies equally where the defendant did not object before the trial court because he failed to recognize an error, and where the defendant did not object because the trial court's decision was correct at the time but assertedly became erroneous due to a supervening legal decision."); *United States v. Asher*, 854 F.2d 1483, 1487 (3d Cir. 1988).

258, 262 (2010) (quoting *Puckett v. United States,* 556 U.S. 129, 135 (2009)); *see also United States v. Andrews*, 681 F.3d 509, 517 (3d Cir. 2012). Georgiou bears the burden of showing that the error affected his substantial rights. *Andrews*, 681 F.3d at 517.

### 2. *Morrison* and Extraterritoriality

Georgiou was convicted of securities fraud pursuant to Section 10(b) of the Act and Section 10(b)'s implementing regulation, SEC Rule 10b-5 ("Rule 10b-5"). 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *see also* 15 U.S.C. § 78ff (prescribing penalties for willful violations of the Act). Section 10(b) makes it unlawful:

> [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).[9]

---

[9] Rule 10b-5, promulgated pursuant to Section 10(b), makes it unlawful "for any person . . . (a) [t]o employ any device, scheme, or artifice to defraud . . . or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. "Rule 10b-5 . . . was promulgated under

11

The Supreme Court has limited the application of Section 10(b) to actors who employ "manipulative or deceptive device[s]" in two contexts: (1) transactions involving "the purchase or sale of a security listed on an American stock exchange," and (2) transactions involving "the purchase or sale of any other security in the United States." *Morrison*, 561 U.S. at 273. Indeed, Section 10(b) has no extraterritorial reach. *Id.* at 262, 266-67 (determining that Section 10(b) and Rule 10b-5 had no extraterritorial effect in civil context); *see also Vilar*, 729 F.3d at 74 (making the same determination in the criminal context, reasoning that "[a] statute either applies extraterritorially or it does not"). Thus, we consider here whether any of the relevant transactions Georgiou is charged with have the requisite nexus to the United States under *Morrison* to subject him to liability under Section 10(b).

It is undisputed that the Target Stocks were listed or traded on the OTCBB or Pink Sheets. However, whether the OTCBB or the Pink Sheets constitute "national securities exchange[s]" under *Morrison*, and whether the securities at issue were purchased or sold in the United States, are both disputed.[10] The Supreme Court has not addressed either issue

§ 10(b), and 'does not extend beyond conduct encompassed by § 10(b)'s prohibition.'" *Morrison*, 561 U.S. at 261-62 (quoting *United States v. O'Hagan,* 521 U.S. 642, 651 (1997)).

[10] The Indictment defines the Pink Sheets as "an inter-dealer electronic quotation and trading system in the over-the-counter ('OTC') securities market," (Indictment ¶ 2) and provides no definition of the OTCBB. The Indictment further states that "[t]he United States Securities and Exchange

12

in this context, i.e., whether a foreign entity's purchase of securities listed on the OTCBB or Pink Sheets through American market makers ought be considered a "domestic transaction" for the purposes of Section 10(b).

### a. "National Securities Exchange"

Under the first prong of *Morrison*, Section 10(b) applies to "the purchase or sale of a security listed on an American stock exchange." *Morrison*, 561 U.S. at 273. Securities listed on the OTCBB and the Pink Sheets are not within these parameters. According to the SEC, there are eighteen registered national security exchanges; the Pink Sheets and the OTCBB are not among them.[11] *See* SEC

---

Commission (the 'SEC') was an independent agency of the United States which was charged by law with protecting investors by regulating and monitoring, among other things, the purchase and sale of publicly traded securities, including securities traded on the Pink Sheets and the OTCBB. Federal securities laws prohibited fraud in connection with the purchase and sale of securities . . ." (Indictment ¶ 8.)

[11] Indeed, the OTCBB is, by definition, a quotation service for "securities which are *not* listed or traded on NASDAQ or any other national securities exchange." *OTCBB Frequently Asked Questions*, FINRA, http://www.finra.org/Industry/Compliance/MarketTransparency/OTCBB/FAQ/index.htm ("OTCBB FAQ") (emphasis added) (last visited Jan. 5, 2015). Likewise, the Pink Sheets may include securities that "[have] been delisted from an exchange." *Frequently Asked Questions*, http://www.otcmarkets.com/learn/otc101-faq (last visited Jan. 5, 2015). Unlike companies listed on a national securities

Website, http://www.sec.gov/divisions/marketreg/mrexchanges.shtml (*hereinafter* "SEC Webpage on National Securities Exchanges") (last visited Jan. 5, 2015); *see also* 15 U.S.C. § 78f(b) (requiring that exchanges register with the SEC and comply with various requirements to constitute a "national securities exchange").

Further, the stated purpose of the Act refers to "securities exchanges" and "over-the-counter markets" separately, which suggests that one is not inclusive of the other. *See* Securities Exchange Act of 1934, 48 Stat. 881, as amended, 15 U.S.C. § 78a *et seq.,* (described as "[a]n Act [t]o provide for the regulation of securities exchanges *and* of over-the-counter markets . . . [and] to prevent inequitable and unfair practices on such exchanges *and* markets") (emphasis added).

Given that a "national securities exchange" is explicitly listed in Section 10(b)—to the exclusion of the OTC markets—and coupled with the absence of the Pink Sheets and the OTCBB on the list of registered national security exchanges on the SEC Webpage on Exchanges, we

exchange, those quoted on the OTCBB and the Pink Sheets are not subject to "listing and maintenance standards, which are stringently monitored and enforced . . . . [and do not] have reporting obligations to the market." OTCBB FAQ.

14

are persuaded that those exchanges are not national securities exchanges within the scope of *Morrison*.[12]

### b. Domestic Transactions in Securities not Listed on Domestic Exchanges

In this case, foreign entities purchased and sold securities quoted on the OTCBB and the Pink Sheets. Several of these purchases were executed by market makers operating within the United States. In contrast, the Court in *Morrison* considered a "foreign cubed action . . . in which (1) *foreign* plaintiffs [were] suing (2) a *foreign* issuer in an American court for violations of American securities laws based on securities transactions in (3) *foreign* countries." *Morrison*, 561 U.S. at 283 n.11 (Stevens, J., concurring in the judgment) (internal quotation marks omitted).[13] In that case, all aspects

---

[12] *But see SEC v. Ficeto*, 839 F. Supp. 2d 1101, 1108 (C.D. Cal. 2011) ("hold[ing] that *Morrison* does not bar the *territorial* application of § 10(b) to manipulative trading on the domestic over-the-counter market"); *see also United States v. Isaacson*, 752 F.3d 1291, 1299 (11th Cir. 2013) (securities traded on the OTCBB or Pink Sheets "meet[] *Morrison*'s requirement for a U.S. nexus").

[13] In *Morrison,* Australian investors purchased shares of an Australian bank whose stock shares were listed on the Australian Stock Exchange Limited. 561 U.S. at 251-52. In 1998, the Australian bank purchased an American mortgage servicing company and for three years touted the success of the American company's business in its annual reports and public documents and statements. *Id.* at 251-52. But in 2001, the Australian bank wrote down the value of the American company's assets by more than $2 billion, which resulted in a

15

of the trades at issue occurred abroad, and thus, it was determined that Section 10(b) did not apply. There are two key distinctions between *Morrison* and the instant case: (1) the transactions in this case involve stocks of U.S. companies, (2) that were executed through American market makers.

To determine whether the transactions at issue were "domestic transactions," under *Morrison*, *id.* at 267, we consider "not . . . the place where the deception originated, but [the place where] purchases and sales of securities" occurred. *Id.* at 266. It is the "location of the *transaction* that establishes (or reflects the presumption of) the [Security Exchange] Act's inapplicability." *Id.* at 268.

Several of our sister circuits interpret this to mean that "a securities transaction is domestic when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States." *Absolute Activist Value Master Fund Ltd v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012); *see also Quail Cruise Ship Mgmt Ltd. v. Agencia de Viagens*, 645 F.3d 1307, 1310-11 (11th Cir. 2011) (allegation that closing in Florida precipitated transfer of title sufficient to satisfy *Morrison* at motion to dismiss); *SEC v. Levine*, 462 Fed. App'x 717, 719 (9th Cir. 2011) ("[T]he Securities Act governs the [] sales because the actual sales closed in Nevada when [a defendant] received completed stock purchase agreements and payments."); *United States v. Isaacson*, 752 F.3d 1291, 1300

---

drop in the value of the Australian bank's stock. *Id.* at 252. The Australian investors sued the bank in the Southern District of New York alleging violations of the Securities Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a). *Id.* at 253-54.

(11th Cir. 2013) (fund at issue "was 'run out of New York City' and [] [defendant's] office was located in Florida, which support[] the inference that the [] [f]und purchased the securities in the United States.")

We agree that "'[c]ommitment' is a simple and direct way of designating the point at which . . . the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time.'" *Absolute Activist*, 677 F.3d at 68 (quoting *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 891 (2d Cir. 1972)) (internal quotation marks omitted). Thus, "the point of irrevocable liability can be used to determine the locus of a securities purchase or sale." *Id.* Accordingly, territoriality under *Morrison* turns on "where, physically, the purchaser or seller committed him or herself" to pay for or deliver a security. *Vilar*, 729 F.3d at 77 n.11.

Facts that demonstrate "irrevocable liability" include the "formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Absolute Activist*, 677 F.3d at 69, 70; *see also Vilar*, 729 F.3d at 78.[14] In *Vilar*, the Second Circuit concluded that Section 10(b) applied where: (1) some victims entered into investment agreements in the United States; (2) another

---

[14] On the other hand, heavy marketing in the United States, a party's residency or citizenship, and the fact that the deception may have originated in the United States were insufficient to support a Section 10(b) claim. *Absolute Activist*, 677 F.3d at 70.

victim "executed the documents necessary to invest . . . in her own New York apartment and handed those documents to a New York messenger"; and (3) one victim sent the money required for opening her account from New York. 729 F.3d at 76-78 (internal quotation marks and citation omitted).

Here, at least one of the fraudulent transactions in each of the Target Stocks was bought and sold through U.S.-based market makers. Government witness and SEC employee Daniel Koster testified that all of the manipulative trades were "facilitate[d]" by U.S.-based market makers, i.e., an American market maker bought the stock from the seller and sold it to the buyer. (App. 1890-96, 1904-05, 1968); *see also* 15 U.S.C. § 78c(38). Therefore, some of the relevant transactions required the involvement of a purchaser or seller working with a market maker and committing to a transaction in the United States, incurring irrevocable liability in the United States, or passing title in the United States. The record also contains evidence of specific instances in which the Target Stocks were bought or sold at Georgiou's direction from entities located in the United States.[15]

---

[15] For instance: (1) on November 3, 2005, Waltzer, who was located in Pennsylvania, sold 69,150 shares of Neutron stock from one of his accounts to another of his accounts; (2) on May 9, 2006, from within the United States, Waltzer sold 100,000 shares of Avicena stock from one of his accounts to another of his; (3) Georgiou deposited 2.5 million HYHY shares into an account in California; (4) on September 3, 2008, an undercover FBI agent purchased 16,000 shares of Northern Ethanol stock from within the United States; and (5) Georgiou wired $5,000 to a bank account in Philadelphia for

18

We now hold that irrevocable liability establishes the location of a securities transaction. Here, the evidence is sufficient to demonstrate that Georgiou engaged in "domestic transactions" under the second prong of *Morrison*, i.e., transactions involving "the purchase or sale of any [] security in the United States." *See Morrison*, 561 U.S. at 273. Thus, the District Court's application of Section 10(b) to Georgiou's transactions was proper.

### c. Jury Instructions

Georgiou argues that under the District Court's instructions, all four of the securities fraud counts may have been based exclusively on foreign margin loan transactions. However, Georgiou fails to demonstrate that the jury relied on a legally insufficient theory. The District Court's jury instructions track the statutory language of Rule 10b-5. *See United States v. Syme*, 276 F.3d 131, 146-47 (3d Cir. 2002). "[T]he longstanding rule [is] that general verdicts will stand even if one of the possible grounds for conviction was unsupported by the evidence." *Id.* at 145. The "'invalid legal theory' exception" to this rule applies "if the indictment or the district court's jury instructions are based on an erroneous interpretation of law or contain a mistaken description of the law." *Id.* Here, there was no such deficiency in the instruction.

the undercover FBI agent, in furtherance of the manipulative trading scheme.

Further, the District Court properly instructed the jury on the elements of securities fraud pursuant to Section 10(b) and Rule 10b-5, including the jurisdictional elements relating to conduct in the United States. (App. 2972-73) (requiring the jury to find beyond a reasonable doubt that "the defendant used or caused to be used the facilities of a national securities exchange or any means or instrumentality of interstate commerce in furtherance of the fraudulent conduct"). The District Court was not required to preclude the jury from considering foreign activity in evaluating the evidence. Furthermore, Georgiou's fraudulent activity in the United States is not rendered lawful because some transactions occurred outside of the United States or because some victims are located in foreign countries.

## B. Extraterritoriality of United States Wire Fraud Statute

Appellant also argues that his wire fraud convictions are improperly based on the extraterritorial application of United States law, and that these convictions are legally insufficient because the Government failed to demonstrate that his conduct violated foreign law. As Georgiou raises this argument for the first time on appeal, we apply plain error review. *Henderson,* 133 S.Ct. at 1124.

Unlike securities fraud, the statute governing wire fraud "prohibits 'any scheme or artifice to defraud,'—fraud *simpliciter,* without any requirement that it be 'in connection with' any particular transaction or event." *Morrison,* 561 U.S. at 271-72 (quoting 18 U.S.C. § 1343). Thus, a wire fraud offense is "complete the moment [a party] executed the scheme inside the United States. . . ." *Pasquantino v. United States*, 544 U.S. 349, 371 (2005). Moreover, unlike the

20

Securities Exchange Act, Section 1343 applies extraterritorially. *Id.* at 371-72. Indeed, the explicit statutory language indicates that "it punishes frauds executed in 'interstate or foreign commerce,'" and "is surely not a statute in which Congress had only domestic concerns in mind." *Id.* (quoting 18 U.S.C. § 1343).

Here, the record contains ample evidence that Georgiou used interstate wires to effect a "scheme or artifice to defraud." 18 U.S.C. §1343. Georgiou regularly used e-mail to direct Waltzer's participation in the fraud and wired money from a Canadian bank to an undercover FBI agent's account in Pennsylvania. (*See, e.g.*, App. 3800-04, 3778-82, 3930-34, 4019.)

In addition, Appellant's argument that *Pasquantino* requires the Government to prove that Georgiou's conduct was illegal in the Bahamas fails. The footnote that Georgiou relies on in *Pasquantino* references foreign tax law for the sole purpose of determining whether the victim had "valuable property interests as defined by foreign law." 544 U.S. at 371 n.13. Here, it is undisputed that the foreign victims had a property interest in the money and property that Georgiou fraudulently obtained from them. Hence, the wire fraud statute is properly applied.

Finally, Georgiou's arguments that the District Court erred because it did not require the jury to limit its consideration to domestic transactions only and permitted the jury to consider invalid legal theories, also fail with respect to wire fraud. As discussed, the text of the relevant statute, 18 U.S.C. § 1343, does not expressly require that a verdict be based on entirely domestic transactions. *Pasquantino*, 544 U.S. at 372-73 (Ginsburg, J., dissenting). Instead, the

21

statute's only jurisdictional requirement is that a communication be transmitted through interstate or foreign commerce for the purpose of executing a scheme to defraud. 18 U.S.C. § 1343.

The District Court properly instructed the jury on this issue, explaining that interstate or foreign commerce is "to send from one state to another, or to or from the United States . . . ." (App. 2985.) This instruction did not impermissibly allow the jury to convict Georgiou based solely on foreign activity. Thus, the District Court did not err with respect to its jury instruction on wire fraud.

Georgiou's argument that the jury may have relied on a legally invalid theory also fails. Here, the District Court's instructions on the elements of wire fraud were proper, and the evidence was sufficient to convict on the market manipulation theory. Thus, the jury was not presented with a legally invalid theory of guilt, and the District Court did not err.

## C. Violations of *Brady* and Jencks Act Disclosure Requirements

Georgiou contends that the Government suppressed evidence concerning cooperating witness Kevin Waltzer's history of mental illness and substance abuse, as well as statements Waltzer made to the SEC, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and the Jencks Act, 18 U.S.C. § 3500.

22

### 1. *Brady* Violations

"Our review of the denial of a motion for new trial on the basis of a *Brady* argument is *de novo* with respect to the district court's conclusions of law and is based on the 'clearly erroneous' standard with respect to its findings of fact." *United States v. Milan*, 304 F.3d 273, 286 (3d Cir. 2002) (citing *United States v. Perdomo*, 929 F.2d 967, 969 (3d Cir. 1991)). Under *Brady*, the Government is required, upon request, to produce "evidence favorable to an accused." 373 U.S. at 87. The failure to do so will result in a due process violation if the suppressed evidence "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* To establish a *Brady* violation, a defendant must demonstrate that: "'(1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material either to guilt or to punishment.'" *United States v. Pelullo*, 399 F.3d 197, 209 (3d Cir. 2005) (quoting *United States v. Dixon*, 132 F.3d 192, 199 (5th Cir.1997)).

Evidence is favorable if it is impeaching or exculpatory. *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Johnson v. Folino*, 705 F.3d 117, 128 (3d Cir. 2013). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome" of the trial. *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 441-54 (1995). Thus,

> "[t]he materiality of *Brady* material depends almost entirely on the value of the evidence

relative to the other evidence mustered by the state." Suppressed evidence that would be cumulative of other evidence or would be used to impeach testimony of a witness whose account is strongly corroborated is generally not considered material for *Brady* purposes. Conversely, however, undisclosed evidence that would seriously undermine the testimony of a key witness may be considered material when it relates to an essential issue or the testimony lacks strong corroboration.

*Johnson*, 705 F.3d at 129 (quoting *Rocha v. Thaler*, 619 F.3d 387, 396-97 (5th Cir. 2010)).

Georgiou argues that the Government suppressed Waltzer's bail report ("Bail Report") and the minutes from Waltzer's arraignment and guilty plea ("Minutes"). Both the Bail Report and the Minutes contain evidence of Waltzer's cocaine use and mental health history. Specifically, the Bail Report references Waltzer's history of treatment for psychiatric disorders and substance abuse. The Minutes include Waltzer's statements about his treatment for depression and anxiety and his use of Paxil, a prescription medication, to treat those conditions.

### a. Waltzer's Substance Abuse

Georgiou argues that the Government failed to disclose evidence of Waltzer's substance abuse in the Minutes and the Bail Report in violation of its *Brady* obligations. However, Appellant received statements concerning Waltzer's drug use in the Government's pretrial production, including notes showing a statement from Waltzer that he "did drugs and

24

drank alcohol . . . and developed an addiction to cocaine . . . [and] last used cocaine six months ago." (Supp. App. 1338.) Indeed, Waltzer testified on direct and cross-examination about his cocaine use. (App. 502-04, 848-49.) Thus, additional evidence of his substance abuse would have been cumulative. *Johnson*, 705 F.3d at 129; *see also United States v. Barraza Cazares*, 465 F.3d 327, 335 (8th Cir. 2006) (no *Brady* violation where "all that was unknown to the defendant and his attorney was the *fact* of Lopez's statement, not the *content* of that statement"). Because evidence of Waltzer's substance abuse was provided to Appellant prior to trial, this material was not suppressed, and the first prong of *Brady* is not satisfied.

Moreover, assuming *arguendo* that evidence of Waltzer's former drug use had been suppressed, such evidence is not favorable to the Appellant for purposes of our *Brady* analysis. At trial, Waltzer testified that his cocaine use did not impact his ability to understand, remember or testify about his interactions with Appellant. (App. 503.) Appellant chose not to probe this issue more fully on cross-examination. (App. 848-49.) There is no evidence—in the pretrial discovery, trial testimony, Minutes, or Bail Report—to suggest that Waltzer's former substance abuse impacted the reliability of his testimony. Thus, because this evidence neither constitutes impeachment nor exculpatory material, it is not favorable to the Appellant.

Finally, evidence of Waltzer's substance abuse cannot be deemed material because there is not a "reasonable probability" that this evidence would have changed the outcome of the trial. *Bagley*, 473 U.S. at 682; *see also Kyles*, 514 U.S. at 454. Indeed, evidence of Waltzer's substance abuse was considered at trial on both direct and cross-

25

examination.  To the extent Appellant argues that additional information about the intensity or duration of Waltzer's substance abuse may have impacted the trial's outcome, he explains neither why he did not probe these issues more fully on cross examination, nor why such new information would have changed the trial's outcome when the substance abuse evidence that was set out at trial did not.  Thus, it cannot be deemed material.

Because evidence of Waltzer's substance abuse in the Minutes and the Bail Report was neither suppressed, favorable nor material, Appellant's *Brady* arguments concerning this evidence must fail.

### b.      Waltzer's Mental Health History and Treatment

Georgiou also argues that information regarding Waltzer's mental health was suppressed in both the Bail Report and the Minutes.  In the Minutes, Waltzer stated that he had seen a mental health provider for depression and anxiety, and was taking Paxil for depression.  However, in response to questioning from the court, he agreed that his "head [has] always been clear," and that his medication did not affect "how [he] think[s]."  (App. 4249-50, 4245, 4355.)  The Bail Report also includes information that Waltzer had "been diagnosed in the past with Anxiety Disorder, Panic Disorder and Substance Abuse Disorder."  (App. 4187.)

The Minutes and Bail Report were not suppressed under the first prong of *Brady* because they were accessible to Appellant.  "*Brady* does not oblige the [G]overnment to provide defendants with evidence that they could obtain from other sources by exercising reasonable diligence."  *Perdomo*,

26

929 F.2d at 973. Indeed, Appellant "was in a position of parity with the government as far as access to this material," *United States v. Jones*, 34 F.3d 596, 600 (8th Cir. 1994), and thus, "the transcript [] was as available to [the defendant] as it was to the Government." *United States v. Ladoucer*, 573 F.3d 628, 636 (8th Cir. 2009) (finding no *Brady* violation from the government's failure to produce the transcript of its witness's state court testimony in an unrelated matter because the defendant "could have obtained a copy of the transcript himself").

Here, as the District Court observed, "it is apparent that with just minimal due diligence on the part of Georgiou, he could have obtained a copy of [Waltzer's] guilty plea transcript because he certainly was aware that the main witness against him had pled guilty before Judge Dalzell." (App. 58.) Likewise, the existence of the Bail Report was not hidden from Appellant, and it could have been accessed through his exercise of reasonable diligence. Accordingly, the Minutes and the Bail Report cannot be deemed to have been suppressed.

Further, evidence concerning Waltzer's mental health is neither favorable to the Appellant nor material. In this case, this evidence neither undermines Waltzer's reliability nor calls into question his "'ability to perceive, remember and narrate perceptions accurately,'" and thus is not "clearly relevant to his credibility." *Wilson v. Beard*, 589 F.3d 651, 666 (3d Cir. 2009) (quoting *Cohen v. Albert Einstein Med. Ctr.*, 592 A.2d 720, 726 (Pa. Super. Ct. 1991)); *see also* 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 607.05[1] (Joseph M. McLaughlin ed., 2d ed. 2014) ("A witness's credibility may always be attacked by showing that his or her capacity to observe, remember, or

27

narrate is impaired. Consequently, the witness's capacity at the time of the event, as well as at the time of trial, is significant.").

The evidence at issue here shows that Waltzer had been seeking medical attention for anxiety and depression for several years, and had been taking medication to treat those conditions. (App. 4187.) In the Minutes, Waltzer stated that his medication did not affect his mental capacity, and the District Judge, the Government, and Waltzer's attorney all agreed he was competent to plead guilty. (App. 4250.) *Cf. Wilson*, 589 F. 3d at 666 (suppressing mental health evidence found material under *Brady* where it showed that witness had "an inability to form adequate perceptions, that he is easily confused, has dissociative tendencies, blackouts, motor visual problems, weak long and short term memory, poor judgment, and distorted perceptions of reality.") (internal quotation marks omitted). Furthermore, evidence of Waltzer's mental illness was not material because, relative to the strength of the evidence against Appellant, there is not a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

### c. Documents from SEC Meetings with Waltzer

Georgiou also argues that the Government violated *Brady* in failing to produce documents from meetings between the SEC and Waltzer. The Government produced pretrial discovery from the SEC, including trading and financial records of the Target Stocks. Subsequent to this production, Georgiou withdrew his discovery motion as moot. (Supp. App. 1228.) However, the Government had not

28

produced notes taken during two SEC interviews of Waltzer, at which members of the prosecution team were present. Subsequent to Appellant's posttrial challenge, the Government reviewed these notes and determined that they did not contain any *Brady* material.

We agree with the District Court's assessment that there is no basis in the record to suggest that these notes contained *Brady* material. Pure speculation that exculpatory information might exist is insufficient to sustain a *Brady* claim. *See United States v. Andrus*, 775 F.2d 825, 843 (7th Cir. 1985) ("'Mere speculation that a government file may contain *Brady* material is not sufficient to require a remand for *in camera* inspection, much less reversal for a new trial.'") (quoting *United States v. Navarro*, 737 F.2d 625 (7th Cir. 1984), cert. denied, 469 U.S. 1020 (1984)). Thus, Appellant has not set out a viable *Brady* claim based on these documents.

\*\*\*

In light of the extensive evidence in the trial record, including recordings of Appellant discussing fraudulent activities, emails between Appellant and co-conspirators regarding manipulative trades, voluminous records of the trades themselves, bank accounts and wire transfers, Appellant's argument that the evidence of Walter's substance abuse and mental illness, or his meetings with the SEC, is material for our *Brady* analysis cannot stand. Waltzer's testimony is "strongly corroborated" by recordings of phone calls and meetings, and records of actual trades. *See Johnson*, 705 F.3d at 129 (citing *Rocha,* 619 F.3d at 396-97). Thus, this evidence would "generally not [be] considered material for Brady purposes" because when considered "'relative to

29

the other evidence mustered by the state,'" the allegedly suppressed evidence is insignificant. *Id.* (quoting *Rocha,* 619 F.3d at 396). Moreover, for the foregoing reasons, the evidence at issue had not been suppressed, nor is it favorable to the Appellant. As such, Appellant's *Brady* arguments must fail.

### 2. Jencks Act Disclosures

The Jencks Act obliges the Government to disclose any witness statement "in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). This requirement is limited to production of statements "possessed by the prosecutorial arm of the federal government." *United States v. Reyeros*, 537 F.3d 270, 285 (3d Cir. 2008) (quoting *United States v. Merlino,* 349 F.3d 144, 154 (3d Cir. 2003)). However, unlike *Brady,* "[t]he Jencks Act requires that any statement in the possession of the government—exculpatory or not—that is made by a government witness must be produced by the government during trial." *United States v. Starusko*, 729 F.2d 256, 263 (3d Cir. 1984).

Here, Appellant has failed to identify any statements that were withheld in violation of the Jencks Act. Indeed, Appellant does not dispute that the Government produced boxes of impeachment evidence concerning Waltzer, including records of Waltzer's numerous prior frauds, evidence of his plea and cooperation, trading and financial records, and prior statements to law enforcement. The additional statements Appellant seeks either were not within the possession of the prosecutorial arm of the government, i.e., those held by the SEC, or do not exist. Likewise, the Government did not have possession of the Bail Report, and

30

thus was not obligated to provide it.  (*See* App. 108-09.) (the Government explained that it neither examined nor took possession of the Bail Report, and the Report included language indicating that it should not be removed from the courtroom.)

## D.     Evidentiary Rulings

### 1.     Koster's Testimony and Summary Charts

After the jury returned its verdict, Georgiou moved for a new trial, arguing, inter alia, that Government witness Daniel Koster, an SEC employee, should not have been permitted to testify as a lay witness under Federal Rule of Evidence 701.  The District Court denied this motion on the grounds that Koster's testimony was permissible under Rule 701.

On appeal, Georgiou again argues that the District Court erred by allowing Koster to testify as an undeclared expert and to offer opinions and legal conclusions that usurped the role of the jury.  He also argues that the District Court admitted prejudicial charts into evidence without providing cautionary instructions to the jury.   The Government responds that these arguments have been waived,[16] and lack merit.

---

[16] The Government submitted a trial memorandum, including the following stipulations reached by the parties: (1) "[v]arious trading records and financial evidence relating to the scheme will be introduced in the form of summary charts and testimony pursuant to Rule 1006"; (2) Koster would "present testimony and accompanying charts concerning the

We review the denial of a motion for a new trial for abuse of discretion. *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003). "'An abuse of discretion arises when the District Court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law[,] or an improper application of law to fact.'" *Pineda v. Ford Motor Co.,* 520 F.3d 237, 243 (3d Cir. 2008) (quoting *In re TMI Litig.*, 193 F.3d 613, 666 (3d Cir. 1999)).

---

manipulative trading activity charged in the indictment"; and (3) Koster may further testify as a "summary fact witness to explain the relevance of his trading analysis to the other evidence presented in the case." (App. 5593-94.) Georgiou objected generally to the use of a summary witness, and to the use of witnesses and charts to summarize anything other than voluminous writings, recordings, or photographs, specifically objecting to summary of oral testimony.

However, Georgiou did not dispute that the "charts and the underlying records have been produced to defendant" and that "defendant has stipulated that [they] are authentic and qualify as business records under Rule 803(6)." (*Id.* at 5594.) Before trial, Georgiou's counsel indicated that he had concerns about the proposed testimony of the Government's SEC witnesses and would be objecting if they "stray[ed] from within [] legal limits," specifically identifying "the issue of opinion testimony or improper summary of things not admissible in evidence." *Id.* at 1520. However, counsel also stated his concerns with the charts had been "resolved." *Id.* Furthermore, at trial, no objections were lodged by Appellant with respect to Koster's testimony, or the admission of charts.

32

"A new trial should be ordered only when substantial prejudice has occurred," *United States v. Armocida*, 515 F.2d 29, 49 (3d Cir. 1975), and "if the interest of justice so requires." Fed. R. Crim. P. 33. To grant a new trial, a court must determine that "the allegedly improper statements or conduct make it 'reasonably probable' that the verdict was influenced by the resulting prejudice." *Forrest v. Beloit Corp.*, 424 F.3d 344, 351 (3d Cir. 2005) (quoting *Greenleaf v. Garlock, Inc.,* 174 F.3d 352, 363-64 (3d Cir. 1999)).

"We review the District Court's decisions as to the admissibility of evidence for abuse of discretion. To the extent that these rulings were based on an interpretation of the Federal Rules of Evidence, however, our review is plenary." *United States v. Serafini*, 233 F.3d 758, 768 n. 14 (3d Cir. 2000) (citing *United States v. Pelullo,* 964 F.2d 193, 199 (3d Cir.1992)).

Under Federal Rule of Evidence 701, if a witness does not testify as an expert, opinion testimony must be: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

Under Federal Rule of Evidence 1006, a party may "use a summary, chart, or calculation to prove the content of voluminous writings [or] recordings . . . that cannot be conveniently examined in court," as long as the originals or duplicates are made available for examination or copying by other parties. Fed. R. Evid. 1006.

Georgiou argues that Koster's testimony was based on specialized knowledge and thus inadmissible from a lay witness. We agree with the District Court's assessment that Koster's testimony, including comparisons of stock quantities and prices did not require prohibited "scientific, technical, or other specialized knowledge," and thus was squarely within the scope of Rule 701. (App. 40.) Koster's testimony provided factual information and summaries of voluminous trading records that he had personally reviewed in his capacity as an SEC employee and as part of the SEC's investigation of Georgiou. *See SEC v. Treadway*, 430 F. Supp. 2d 293, 321-22 (S.D.N.Y. 2006) (rejecting challenge to admissibility of testimony of SEC witness under Rule 701 because witness was "simply an SEC employee providing his view of the facts as a summary of certain evidence and as an aid to the Court," and that witness's declaration "was more akin to a summary document than an expert analysis"). Because Koster "present[ed] testimony and accompanying charts concerning the manipulative trading activity charged in the indictment . . . [and] explain[ed] the relevance of his trading analysis to the other evidence presented in the case," within the scope of Rule 701 and the parties' pretrial stipulation, the District Court did not abuse its discretion in admitting his testimony as a lay witness. (Gov't Trial Mem., App. 5594.)

The District Court also did not abuse its discretion in allowing Koster's remaining testimony on re-direct because Georgiou's counsel first elicited Koster's opinion on cross-examination. Under the doctrine of curative admissibility, i.e., "opening the door," "when one party introduces inadmissible evidence, the opposing party thereafter may introduce otherwise inadmissible evidence to rebut or explain

the prior evidence." *Gov't of the Virgin Islands v. Archibald*, 987 F.2d 180, 187 (3d Cir. 1993) (citing C. McCormick, *On Evidence* § 57 (4th ed. 1992)).

### 2. Exclusion of evidence pursuant to FRE 608(b)

Georgiou also argues that the District Court erred in prohibiting testimony and extrinsic evidence regarding allegations of a post-cooperation fraud perpetrated by Waltzer.[17] The District Court excluded this evidence as collateral and cumulative under Federal Rules of Evidence 608(b) and 403. The District Court's decisions regarding the admissibility of evidence are reviewed for abuse of discretion. *Serafini*, 233 F.3d at 768 n. 14 (citing *Pelullo,* 964 F.2d at 199).

Under Rule 608(b) of the Federal Rules of Evidence, "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b). Further, Federal Rule of Evidence 403 authorizes a district court to "exclude collateral matters that are likely to confuse the issues." *United States v. Casoni*, 950 F.2d 893, 919 (3d Cir. 1991); *see also* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . confusing the

---

[17] Appellant sought to call a law enforcement agent to testify about his investigation of Waltzer on unrelated crimes, and seven lay witnesses to testify that they were victims of an unrelated fraud perpetrated by Waltzer. He argued that this testimony would show Waltzer's bias and pattern of fraud.

issues . . . or needlessly presenting cumulative evidence."). A matter is collateral if it is "factually unrelated to [the] case" such as an "unrelated criminal investigation." *Casoni*, 950 F.2d at 919. Moreover, given the District Court's "wide discretion in limiting cross-examination[,] [a] restriction will not constitute reversible error unless it is so severe as to constitute a denial of the defendant's right to confront witnesses against him and it is prejudicial to substantial rights of the defendant." *Id*. (quoting *United States v. Adams,* 759 F.2d 1099, 1100 (3d Cir. 1985)).

Georgiou's rights under the Confrontation Clause were not implicated here, as the record reflects that the District Court allowed Appellant to cross-examine Waltzer about his alleged criminal acts, and limited further questioning only after Waltzer denied engaging in misconduct. (App. 803-819; 835-846; 867-872.) *See Casoni*, 950 F.2d at 919 ("The Supreme Court has said the Constitution's Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent, the defense might wish.") (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986)).

The District Court's imposition of a reasonable limit on the scope of cross-examination was permissible in order to "strike a balance between the constitutionally required opportunity to cross-examine and the need to prevent repetitive or abusive cross-examination." *Casoni*, 950 F.2d at 919. By the time Appellant sought to cross-examine Waltzer on his involvement in post-cooperation fraudulent activities, the record already contained evidence of Waltzer's past illegal conduct and his cooperation with the Government, all of which is directly relevant to Appellant's theory that

Waltzer was biased in favor of the government. (App. 835-846; 867-872.) Indeed, Appellant directly questioned Waltzer on whether he was untrustworthy and biased for the Government. *Id.* Because "[t]he jury was in possession of sufficient information to make a discriminating appraisal of [the witness's] possible motives for testifying falsely in favor of the [G]overnment," the District Court did not abuse its discretion in excluding certain extrinsic evidence and limiting the cross-examination of Waltzer. *See U.S. v. McNeill*, 887 F.2d 448, 454 (3d Cir. 1989).

### 3. Motion to unseal

We reject Georgiou's argument that the District Court erred in denying his motion to unseal. Georgiou filed the motion after filing a notice of appeal with this Court, appealing the District Court's denial of his Motion for Reconsideration and New Trial. "The filing of a notice of appeal . . . confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58 (1982). Because the District Court lacked jurisdiction at the time Appellant filed his motion to unseal, there was no error in denying this motion.

### E. Sentencing

The District Court sentenced Georgiou to 300 months' imprisonment, followed by a three-year term of supervised release, and ordered restitution of $55,832,398, a special assessment of $900, and forfeiture of $26,000,000. Georgiou challenges this sentence as procedurally and substantively unreasonable, arguing that the District Court erred

37

procedurally in failing to apply *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336 (2005), to the Guidelines loss calculation, resulting in substantive error.

Georgiou also challenges the sentence enhancements on the grounds that the District Court did not require the Government to properly establish the number of victims for a six-point enhancement under U.S.S.G. § 2B1.1 (b)(2)(C). Georgiou further argues that the District Court erred in adding six levels to the Guidelines range due to the dissolution of Caledonia and the sophisticated nature of the fraud. Finally, Georgiou asserts that the District Court erred in basing restitution on the Guidelines loss calculation, and in its imposition of the forfeiture order.

The District Court determined that the total actual losses amounted to $55,832,398. This calculation accounted for the losses suffered by: (1) the three institutions Georgiou defrauded through his use of manipulated stocks, namely, Accuvest ($3,613,856), Alliance ($5,890,748), and Caledonia ($22,000,000) (*see* App. 5489); (2) Alex Barrotti ($16,000,000), to whom Georgiou made a false promise to cover trading losses for trades made at Georgiou's direction (*see* App. 5488); and (3) numerous victim shareholders who bought HYHY stock during Georgiou's "pump and dump" scheme ($8,327,794). (*See* App. 5491, Supp. App. 996.)

Based on these figures, Georgiou received a 24-level increase to the base offense level of seven pursuant to U.S.S.G. § 2B1.1(b)(1)(M) (providing for a 24 point enhancement where the loss exceeds $50,000,000). (App. 5516-24; App. 5308.)

Our "review of a district court's decision regarding the interpretation of the Sentencing Guidelines, including what constitutes 'loss,' is plenary." *United States v. Napier,* 273 F.3d 276, 278 (3d Cir. 2001) (quoting *United States v. Sharma*, 190 F.3d 220, 226 (3d Cir. 1999). We review factual findings for clear error. *Id.* (citing *Sharma*, 190 F.3d at 229).

### 1. Loss Calculation

Georgiou argues that the District Court incorrectly calculated the total loss attributable to his offense, resulting in a higher total offense level. He contends that the loss calculation contained in the Presentence Investigation Report ("PSR") was grossly overstated because it ignored the impact of market forces on the values of the Target Stocks. Georgiou asserts that such an assessment is required under *Dura Pharmaceuticals,* 544 U.S. 336.

Although it is undisputed that the District Court did not consider the impact of market forces in its loss calculation, it was not required to do so. *Dura Pharmaceuticals* was decided in the context of a civil securities fraud class action. *Id.* at 341. While some of our sister circuits have applied the *Dura Pharmaceuticals* loss calculation in the criminal sentencing context, we have not. Thus, there is no basis on which to find the District Court's loss calculation clearly erroneous. Indeed, the record here indicates that the accounts responsible for the losses in the Target Stocks were controlled by the Appellant and his co-conspirators. Appellant conceded as much in recorded conversations. (*See, e.g.*, App. 702-05, 725-32, Supp. App. 1101-11.)

Moreover, assuming *arguendo* that an error had occurred in failing to assess the impact of market forces on the Target Stocks, any such error would be harmless. In applying Section 2B1.1(b), courts must use "the greater of the actual or intended loss." U.S.G.G. § 2B1.1 cmt. n.3(A). During sentencing, the District Court found that Georgiou was responsible for intended losses that "far exceeded a hundred million [dollars]" based on his scheme involving Northern Ethanol. (App. 5485-86, 5490.) However, the District Court did not consider intended losses in its calculation because Georgiou's total offense level, 45, already exceeded the guideline maximum of 43. (App. 5308.) Therefore, under either calculation, Georgiou's total offense level would have been in excess of 43. Thus, his sentence was not impacted by the District Court's alleged error.

### 2. Victim Enhancements

Georgiou's challenge to the six-level upward adjustment for 250 or more victims under U.S.S.G §2B1.1(b)(2)(C) also fails. The jury found that Appellant participated in a "pump and dump" scheme with HYHY, and had paid for a mailer on the stock to be sent to seven million people. (Supp. App. 987.) Koster, the SEC witness, identified 1,918 investor accounts that purchased the stock during the period of the scheme, each of which lost over $1,000. (App. 5427-29.) Thus, there were well over 250 victims, and the District Court's upward adjustment based on number of victims was not clearly erroneous.

### 3. Forfeiture

Georgiou did not object—though he had several opportunities to do so—to the Court's imposition of the

forfeiture order, which had been submitted to the Court prior to sentencing. Thus, any claims on the basis of this forfeiture have been waived. Furthermore, even absent the waiver, the forfeiture is proper under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) because the $26,000,000 subject to forfeiture "constitutes, or is derived from proceeds traceable to the offenses of which the defendant was convicted." (*See* App. 1355, 1378-79, 1392-1402, 1415, 1482-96, 1836-38, 5488-89, Supp. App. 995-96.) Because Appellant waived his objections and because the order was, in fact, proper, there is no basis for a finding of clear error with respect to the forfeiture.

## V.

For the reasons stated above, we will affirm Georgiou's Judgment of Conviction.